Argued November 19, 1976, reversed and remanded with instructions January 31, reconsideration denied February 16, petition for review denied February 23, 1977

# In the Matter of the Dissolution of the Marriage of
## NIEDERT, *Respondent,*
### *and*
## NIEDERT, *Appellant.*
### (No. 411-608, CA 6607)

559 P2d 515

Garth S. Ledwidge, Gresham, argued the cause and filed the brief for appellant.

C. David Hall, Portland, argued the cause for respondent. With him on the brief was Rask & Hefferin, Portland.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

TANZER, J.

THORNTON, J., dissenting.

## TANZER, J.

This is an appeal from an order changing custody of the parties' nine-year-old daughter from the mother to the father. The issue is whether there was an adequate showing of changed circumstances[1] to justify the order. The trial court did not specify the circumstances which it deemed to be sufficiently changed to justify the modification. To have done so, would have been helpful on review. We review the record de novo, giving weight to the trial court's comments regarding credibility.

A decree dissolving the parties' marriage was entered on August 28, 1975. In accordance with the agreement of both parties, custody of the child was awarded to the mother. On April 13, 1976, seven-and-a-half months after the entry of the original decree, the husband filed a change-of-custody show cause motion.

At the time of the hearing the father was employed as a sales representative, the same position he held at the time of the original decree. His job requires him to make occasional overnight business trips. He has remarried since the decree and his new wife is willing and apparently able to devote all of her energy to the care of the child and the maintenance of a family home. Since the decree the father has moved from a small apartment into a three-bedroom home.

Prior to the change of custody motion, the child spent nearly every weekend and most of her school holidays with her father and his new wife. These visits were mostly spent taking vacation trips, visiting with the father's family and in other family-related activities. She has developed a close and affectionate relationship with both her father and her stepmother

---

[1] Custody of children, once determined, should not be changed in the absence of a substantial change of circumstances. *Bogh v. Lumbattis,* 203 Or 298, 280 P2d 398 (1955); *Mackey v. Mackey,* 9 Or App 113, 496 P2d 21 (1972); *McCutchan v. McCutchan,* 5 Or App 96, 483 P2d 93 (1971).

and she told the circuit court that she would prefer to live with them rather than with her mother.

The mother is employed, as she was at the time of the dissolution, as a registered nurse. Her schedule, which requires her to work from 2:30 p.m. until 11 p.m. approximately three nights per week, has not changed since the entry of the dissolution decree. She prefers this shift because of the importance she attaches to seeing her child off to school each morning, which would be impossible if she worked any other shift. When the mother works, the child is with babysitters from shortly after she arrives home from school until late at night. Following the dissolution, the child stayed with neighbors at these times. Rather than waking the child late at night, the mother frequently allowed her to stay with the neighbors overnight. Later the mother retained a succession of three women to serve as live-in babysitters. The arrangement called for one of the women to be home by 5 p.m. when the mother worked. Thus the child was left alone from 2:30 p.m. until 5 p.m. on those nights. Occassionally, the sitters were late and the child was left alone even longer. However, the child knew how to contact her mother at work and there was a neighbor nearby to whom the child knew she could go in an emergency.

Since the dissolution decree the mother has developed a relationship with a physician at the hospital where she is employed. They admit that they have occasionally been physically intimate while the child has been playing in or around the house, but deny the father's charge that the child has seen them in bed together. The physician has not stayed with the mother overnight. In an *in camera* interview, the child indicated that her mother and the doctor occasionally talk privately in the bedroom, but that she had never actually seen them doing so. The record gives no indication that the relationship disturbed the child in any way.

The father presented other evidence in an effort to show that the mother's care was inadequate. It was charged that the child's hygiene was poor, that her grades in school were falling, that she was poorly fed and that she was frequently left alone in the morning to prepare for school and fix her own breakfast while the mother slept. All of these charges were contradicted by evidence presented by the mother. The evidence in support of the charges was not impressive to the trial court and is not to us. Moreover, the father testified that these circumstances existed during the marriage and at the time of the dissolution. In short, the only changed circumstances established at the hearing were the father's remarriage, the mother's relationship with the doctor, and the changes in child care arrangements for evenings when the mother worked.

The change-of-circumstance rule is designed to serve two functions: to discourage repeated litigation of the same issues and, more important, to provide young children with a stable environment. *Crane v. Crane,* 17 Or App 637, 523 P2d 596 (1974). We have long recognized the importance of a stable and secure home life and have consequently placed a high value on the stability of parental relationships.[2] Therefore the rule requires a showing of some change in circumstances which makes either the benefits to be gained from a change of custody or the detriment caused by not making the change outweigh the damage done to a child who is exposed to shifting parental figures. *McCutchan v. McCutchan,* 5 Or App 96, 483 P2d 93 (1971).

The father has failed to make such a showing. The mother's relationship with the doctor does not constitute such gross moral misconduct as has been held

---

[2]In *Smith v. Green,* 4 Or App 533, 537 (n. 1), 480 P2d 437 (1971), and *McCutchan v. McCutchan,* 5 Or App 96, 99, 483 P2d 93 (1971), we quoted with approval a statement by Dr. Andrew Watson, psychiatrist and professor of law, who said that stability is "practically the principal element in raising children, especially pre-puberty ones."

[ 313 ]

sufficient to justify a change in custody. *Sullivan v. Sullivan,* 236 Or 192, 387 P2d 571 (1963); ORS 107.137(4). The other cases cited in the dissent are not to the contrary; none is precedent for the proposition that discreet sexual intimacy between single adults is a moral transgression justifying a change of custody.

■    Similarly, the mother's difficulty in arranging child care does not rise to the level of parental neglect which has been held to constitute a substantial change of circumstances. *Gwinner and Gwinner,* 24 Or App 743, 547 P2d 151, *rev den* (1976); *Yeamans v. Yeamans,* 17 Or App 556, 523 P2d 565, *rev den* (1974). A single working parent must necessarily rely upon the assistance of others in the care of his or her children. This father chose not to seek custody of the child at the time of the separation and dissolution, because of the difficulty he would have had. The mother accepted custody despite the difficulty. Her arrangements have occasionally been makeshift, but the child was never left without resources.

■■    In this proceeding the mother's performance as a parent has been closely examined and vigorously attacked. As a result, isolated instances of poor judgment or indiscretion have been disclosed, but it is doubtful that any parent's performance would appear unblemished upon such close scrutiny. A change of circumstances is not established by showing that the custodial parent has made occasional mistakes since the entry of the decree, for every parent does, and a working parent in particular may have special problems of child care. Where the proof of change of circumstances is based upon specific instances of purported parental misfeasance—and often that is the only knowledge available to a concerned noncustodial parent—these events must be of a nature or number that reflect a course of conduct or pattern of inadequate care which has had or threatens to have a discernable adverse effect upon the child. No such showing has been made here.

■ Nor has the father shown that the benefits to be derived from a custody change outweigh the need for stability. The primary reason that the trial court ordered a change of custody was because the father was, since his remarriage, capable of providing the child with a family environment.[3] Although a two-parent home is usually preferable, remarriage of the noncustodial parent does not of itself justify the upset and confusion which necessarily accompany a change of custody. To hold otherwise would encourage divorced parents to race to the altar.

■ The closest thing to a substantial change of circumstances is found in the astute, but less tangible observations of the court's family counselor. He concludes that the father was the primary nurturing parent during the marriage because of the mother's work schedule, and that the child's gravitation toward the father's new two-parent home has become more pronounced since the separation. The adjustment of a child to the post-separation situation is properly considered if the change-of-circumstance rule is not to become formulaic. Here, the child's adjustment was influenced by a visitation arrangement which put her with her father for most of the good times and with the mother for everyday life. The child's relationship with her mother is further undermined, intentionally or otherwise, by such things as the father not allowing the child to bring her at-home clothes to his house on visits.

The child's adjustment to a dissolution would best be served by her realization that the custodial home is her permanent home, however green the other

[3] The trial court found that the child was "in crying need of the kind of stability and family life that she kept asking her mother for" and that "the child has found a family * * * being supplied by the father." The Family Services Department of Multnomah County recommended that custody be changed to the father primarily because of the child's desires and because of the developing family relationship between the child and her father and stepmother. The record also strongly implies that the father would prefer to minimize any contact between the child and her mother and his conduct openly reflects that unfortunate attitude.

parent's pasture may be, and that it will not be changed simply because of the practical difficulties of a working custodial parent or the earlier remarriage of the noncustodial parent. That is what the policy of stability, which the change-of-circumstance rule is designed to promote, is all about, and it is the responsibility of both parents to work to that end.

█ ██ It is clear from the record that, despite the bitter accusations of both parties, the court must here choose between two competent and loving parents. In such a case the interests of the child are better served by maintaining the status quo than by attempting to determine which parent and which reasonably suitable home is more satisfactory. Accordingly, we hold that there was not here a change of circumstances sufficient to justify a change of custody.

This legal solution, however, leads us not to a practical solution, but rather to a dilemma. A stay of the order changing custody was neither requested nor granted. Custody was actually transferred to the father on June 12, and he has already moved to modify the visitation clause by severely restricting the mother's rights. The child has now been in the father's home for over six months. The effect of a reversal will be to take the child away from her home once again to return her to her mother, thereby disrupting the child's present situation. It is anomalous for us to order yet another uprooting of this nine-year-old in furtherance of the policy of preservation of the stability of her home environment.

█ ██ To refuse to reverse a change of custody order entered in the absence of a substantial change of circumstance, however, would be to deny the aggrieved parent the right granted under ORS 107.115(3) to appeal an erroneous order. It is our function to hear this case de novo upon the record compiled in the trial court as of the time it was heard in the trial court, and it would be unfair to the mother to deny her custody of her child solely because of the

immediate execution of an erroneous order. Therefore, we reverse the modification order and remand for entry of an order denying the motion for change of custody.

In the process of entering a new order, we trust that the trial court will take reasonable steps to assure itself that the child will be returned with a minimum of emotional trauma and with as healthy a personal adjustment as the circumstances permit. The order should provide for the father's full cooperation in making the transition.

The appeal process in custody cases will by the very awkwardness of its nature cause similar practical problems in future cases. Such problems should be avoided if possible. Where a change of custody is ordered and the question is close or presents no imminent danger to the child's welfare, a stay should be granted to freeze the situation. In that way, the entitlement of a parent to de novo appellate review can be preserved without unnecessary emotional cost to the child. A motion for a stay should first be made to the trial court which, having seen and heard the witnesses, is in the best position to decide upon the wisdom of a stay. If a stay is denied, it would be well if the trial court explains its reasons for the denial so that if a subsequent application is made to this court for a stay, we may give all due weight to the trial court determination. *Cf. Von Weidlein/N.W. Bottling v. OLCC,* 16 Or App 81, 514 P2d 560, 515 P2d 936, 517 P2d 295 (1973), *rev den* (1974).

Reversed and remanded with instructions.

**THORNTON, J.,** dissenting.

Contrary to the majority, my conclusion after reading the transcript of testimony is that the father did establish by a clear preponderance of the evidence (1) a sufficient change of circumstances and (2) that these circumstances were injuriously affecting the nine and one-half year old daughter of the parties. I

agree with the trial judge and the experienced investigator for the Multnomah County Court of Domestic Relations, who conducted a custody study, that the interests of the daughter would unquestionably be best served by transferring the custody to the father.

I will not attempt to detail the evidence. Most persuasive to me of the need for a change of custody was the following: First, the testimony indicating that the child was often left unattended and required to fend and care for herself at night. This resulted from the mother's unwillingness to change her work schedule to better coincide with the child's school schedule. Despite the demonstrably ill effects of this schedule upon the child, the mother clung tenaciously to it, thus indicating her priorities so far as this child is concerned.

Second, I have a great deal of concern for the effect upon the child of the mother's having intimate relations with a man in the home and in close proximity to the child.

As I read the decisions cited below, the courts of this state are saying that it is not conducive to the wholesome and proper upbringing of a child of formative years for her to be exposed to a home situation where the custodial parent is having intimate relations in the home or in close proximity to the child, with a person to whom the parent is not married. See, for example, the following cases where a similar conclusion was reached in comparable factual situations: *Sullivan v. Sullivan,* 236 Or 192, 387 P2d 571 (1963); *Gunderson and Gunderson,* 26 Or App 115, 551 P2d 1317, Sup Ct *review denied* (1976); *Dahlman and Dahlman,* 20 Or App 375, 531 P2d 909, Sup Ct *review denied* (1975); *Sarty v. Forney,* 12 Or App 251, 506 P2d 535 (1973); *Mace v. Mace,* 9 Or App 435, 497 P2d 677 (1972). *See also, A. v. A.,* 15 Or App 353, 514 P2d 358, 515 P2d 730 (1973), Sup Ct *review denied* (1974). In *A. v. A., supra,* the custodial parent of two children was alleged to be engaged in a homosexual relationship

with a man who was living in the family home. We affirmed the decision of the trial judge requiring that the man cease living in the home and that there be no sexual relations with him in the home.

In the case at bar the inference I glean from the testimony is that the minor daughter of the parties was not only aware of the sexual relations in the home at these times, she was disturbed by it.

I do not contend, nor do I read the above decisions as holding that a divorced and unremarried parent is precluded from having sexual encounters.[1] The rationale of these decisions is simply that such encounters should not occur in close proximity to the child or under circumstances which are known to, and can, have an adverse effect upon the child. As we noted in *Dahlman and Dahlman, supra,* a mother's extramarital actions and relationships would not permanently disqualify her from being awarded custody; however, such matters must be considered together with other relevant factors in determining what is in the best interests of the child or children.

Thirdly, I find persuasive here the long established rule of judicial restraint which is normally observed by appellate courts in dealing with child custody appeals. While we of course review de novo in child custody matters, here perhaps more than in any other area of domestic relations law, the conclusions of the trial judge, who sees and hears the parents, the child and the witnesses face-to-face, should be accorded the greatest weight. As we stated in *Brown v. Brown,* 4 Or App 621, 625-26, 481 P2d 643 (1971), in upholding the child custody decision of the trial judge:

"* * * Great caution should be exercised by an appellate court in overturning a decree of a trial court as to the custody of children where the determination is purely one of fact and the evidence is sufficient to warrant the conclusion reached by the trial judge. *Stonebrink v. Stonebrink,* 2 Or App 328, 468 P2d 546

[1] *See, Vaughn and Vaughn,* 25 Or App 655, 550 P2d 1243 (1976); *Vann and Vann,* 24 Or App 31, 544 P2d 175, Sup Ct *review denied* (1976).

(1970); *Cooley v. Cooley,* 1 Or App 223, 227, 461 P2d 65 (1969). This principle was well stated in *Rea v. Rea,* 195 Or 252, at 261, 245 P2d 884 (1952):

> " '* * * [W]e have grave doubts as to whether any appellate court, acting on a cold record, is as likely to arrive at a wise decision concerning child custody, as is the trial judge who sees the parents, hears the testimony, and observes the child. It is for this reason that we have repeatedly held that the decision of the trial court is entitled to great weight in such cases. This court is ill-equipped to exercise a wise and humane discretion on a record which, of necessity, fails to disclose the subtle, but highly persuasive, evidences which are manifest to the trial judge. A wise appraisal of the character, fitness, emotional stability, affection, hostility, or motive, of the parties to a contested divorce case, who are competing for the custody of a child, or a like appraisal of the inner attitude of the child itself, requires more than can generally be made to appear on the printed page.'
>
> " '* * * * *.' "

Fourth, and perhaps most important of all, I think, is the matter of the wishes of the child, Roxanne, as to custody. Roxanne has lived in both environments and has repeatedly stated that she does not wish to return to her mother's home to live, and wants to go with her father. I am of course aware that this is not conclusive. I believe, however, it should be accorded considerable weight in this case. From my examination of the testimony, I am fearful that ordering Roxanne to go back to the environment which she has so consistently and emphatically rejected, will be productive of irreparable long range damage to this child. I base this conclusion, not only on the report and testimony of the court's investigatory officer, but on the statements of the child. The investigator, a man with 12 years' field experience in his present position in addition to his special education and training, stated in his official report as follows:

> "The most obvious impression gained in this study is the close relationship between Roxanne and her father. She really sees him as her nurturing parent. She appears

rather fearful of her mother and really striving to weave her way into a two parent home. My concern is that she will regress if not allowed to live with her father. She is apparently less happy in school and is reportedly having problems dealing with her peers.

"The mother tends to deny the problem and does not appear to be aware of the psychological implications.

"On the basis of my study of this case it is suggested that Roxanne be given an opportunity to live with her father."

Even more informative than the report was the investigator's testimony at the trial. Excerpts appear in the margin.[2]

The central impression one receives from this record is that of a little girl who was often extremely lonely and unhappy in her surroundings while living

---

[2] "A [Mr. Brune, investigator] My recommendation was that Roxanne would be with her father. This was based upon the—my impressions of the parties involved, particularly, in reference to Roxanne's desires and her feelings at this point. I think that she—in this situation really has developed kind of an outstanding relationship with her father due to circumstances and the mother's working situation and that she was really striving to stay with her father. And she had been with him as much as possible, vacations and weekends and so forth. And she really in her own little way in her own mind was trying to develop a family unit and really saw this—her position with father and stepmother as being part of a family. And I don't think she was experiencing this with her mother.

"Q [Father's counsel] I note in your statement in that 'She appears rather fearful of her mother.' What led you to that conclusion?

"* * * * *

"A The fear. During the interview she was very cautious in talking with me about what I might say to her mother and I said that this was between the two of us. And I said, 'Well, why are you fearful?' and she said, 'That mother would become angry with me and chase me around the house and scream at me.' I think those are the terms.

"* * * * *

"Q [Mother's counsel] * * * Now, why do you feel she would regress if not allowed to live with her daddy?

"A [Mr. Brune] My impression was in talking with Roxanne that she is really very much into living with her father and that as she is now nine years of age she is in pre-adolescence, she is working through a lot of feelings about parental figures. She has a strong desire to live with her father. I think that we'll see some regression on her part if

with her mother and various babysitters. It is apparent that she found happiness in her periodic visitations with her father and stepmother. She learned that in their home she could and did receive the care, nurture, parental companionship and stability for which she yearned, but which she found lacking with her mother and her babysitters. She is obviously trying every way she can to escape from her adverse environment and join her father's household.

To ignore Roxanne's pleas and send her back to be reared in the old environment and in the same manner as before would be a traumatic emotional experience for this child which could well have lasting psychological aftereffects.

For all the reasons discussed above, I am unable to join the majority and therefore respectfully dissent.

---

this doesn't happen, that there will be a breach between mother and daughter. This is my, I wouldn't say prediction, but this is what I'm feeling from this situation.

"* * * * *

"THE COURT: Mr. Brune * * * What did you see—and you made some pretty strong statements in the report which I normally don't get, where the psychological needs of the child or psychological implications apparently were not being met by the mother. In what way?

"THE WITNESS: Well, I think basically the feeling of being part of a family, of having someone that she could talk with, feeling generally comfortable with the parent. My feeling was, Your Honor, that this relationship between the father and the daughter was developed when the mother was working evenings and they were together a good deal of time and that he prepared the meals, put her to bed, helped her with school work, this type of thing and that this relationship has continued even after the divorce."