Argued February 28, affirmed, costs to neither party May 2, 1977

In the Matter of the Dissolution of the Marriage of
MOFFETT, *Appellant,*
*and*
MOFFETT, *Respondent—Cross-Appellant.*
(No. 21821, CA 7033)

563 P2d 741

Gary G. Jones, Salem, argued the cause for appellant. With him on the brief was Rhoten, Rhoten & Speerstra, Salem.

J. Philip Parks, Salem, argued the cause for respondent—cross-appellant. With him on the brief was Miller, Beck & Parks, Salem.

Before Schwab, Chief Judge, and Lee and Johnson, Judges.

LEE, J.

Johnson, J., dissenting opinion.

**LEE, J.**

■ Appellant-mother seeks review of an order of the circuit court which modified the provisions of a decree of dissolution entered on November 13, 1974 by transferring custody of the parties' two children, a ten-year-old son and a nine-year-old daughter, to father and eliminating the father's child support obligation. The sole issue raised by mother's appeal is whether, as the party seeking the modification of the decree, father met his burden of establishing a material "change of circumstances" justifying the order.[1] Father has also filed a cross-appeal, arguing that the court abused its discretion in granting mother a judgment against him in the amount of $1,575 as an award of attorney fees.

Some six months after the entry of the dissolution decree mother married her present husband, the custodial parent of three minor children of his own. The great weight of the evidence indicates that the son of the parties has had a very difficult time adjusting to the integration of his mother's and stepfather's families and has in fact developed serious emotional problems which have severely disrupted his relationships with both his mother and his stepfather and effectively rendered him incapable of "getting along" in their home. Having seen the children in August of 1975 and again in June of 1976 a pediatrician experienced in working with emotionally disturbed children offered the following unequivocal opinion upon which the court below "relied heavily" in deciding that the

---

[1] ORS 107.135(1) gives the domestic relations court authority to provide for the continued care and custody of minor children of divorced parents through modification of the decree as it relates to such children. Necessarily taken in the best interests of the children involved, any modification must be based on a material change in the circumstances of the parties occurring since the entry of the decree itself or its most recent modification. *Niedert and Niedert,* 28 Or App 309, 559 P2d 515, Sup Ct *review denied* (1977); *Harder v. Harder,* 26 Or App 337, 552 P2d 852 (1976); *A. v. A.,* 15 Or App 353, 514 P2d 358, 515 P2d 730 (1973), Sup Ct *review denied* (1974).

interests of the children would be best protected by a change of custody:

> "I feel that from the situation as these children described it to me, it was impossible for me to see how the children remaining in their mother's and step-father's home, how the situation could be worked out so that [the son] would adjust to that home. It seemed that over the two interviews it had gotten much worse for them, that whatever had happened to try to socialize him in this family had not worked. It was getting worse, that he and [the daughter] were extremely close, they were a unit * * *.

> "So that I feel that since the situation in which they're living seems an impossible one for [the son], I can't conceive how it will improve at this point. And the situation with the father seems quite good as far as I can tell. He has a very good relationship with both children, and they feel comfortable with him. They seem to trust him. I think that their interest would best be served by being with their father."[2]

Like the court below we are satisfied that despite what appear to be the good intentions of the mother the existing arrangement has proven to have had a particularly damaging effect on the son; in light of the difficult situation that has arisen over the last two years, we believe that a material change of circumstances has occurred and that the interests and welfare of both children[3] will be best promoted by placing

---

[2]Interviewed by both the pediatrician and a psychiatrist, both children consistently expressed a desire to live in their father's home, indicating that the son's inability to avoid problems with both his mother and stepfather has led to an intolerable emotional situation.

[3]In *Amundson v. Amundson,* 7 Or App 33, 35, 489 P2d 983 (1971), we held that "[n]otwithstanding the existence of legal authority in this state which authorizes a court to separate children of divorc[ed] parents from each other, we disapprove of such action except in * * * cases where there are compelling reasons for doing so. The controlling and paramount question in such cases is the welfare of the minor children * * *." We continue to adhere to that view. The evidence in this case indicates that the children involved share a very close relationship and are dependent upon each other for emotional support; under these circumstances the interests of each would appear to be best protected by placing them both in the custody of the same parent.

them in the custody of their father, subject to mother having "reasonable and liberal" visitation privileges.

■ On appeal father argues that because mother failed to introduce competent evidence demonstrating her incapacity to pay her own attorney fees, the court abused its discretion in granting her an award of those costs. Under the circumstances we believe it would, however, be inappropriate to allow father to raise for the first time here the question of whether the court's seemingly broad discretion to award attorney fees in modification proceedings[4] is limited by the necessity for such a showing. The record reveals that at no point in the course of the proceedings below did father suggest to the court that any showing of need ought to have been made; on the contrary, the evidence suggests quite strongly that father chose to acquiesce in the granting of what appears to have amounted to a "consolation" award to the mother. In light of his endorsement of the award of attorney fees by the trial court, father's challenge at this time comes too late.

Affirmed. Costs to neither party.

**JOHNSON, J.,** dissenting opinion.

The majority opinion states that "[t]he great weight of the evidence indicates that the son of the parties has had a difficult time adjusting to the integration of his mother's and stepfather's families and has in fact developed serious emotional problems * * *." To the contrary, the uncontradicted evidence is that the son does not have serious emotional problems, but is a hyperkinetic child suffering from a degree of impulsivity, which in other words means a child with difficult behavioral and learning problems. In 1972, two years prior to the divorce, the parents had taken

---

[4] Prior to its amendment in 1973, Oregon Laws 1973, ch 502, § 9, ORS 107.135(3) provided that a court might "assess a reasonable attorney fee against an unsuccessful moving party who file[d] a motion to set aside, alter or modify a [dissolution] decree * * *"; that statute now authorizes a court to "assess against either party a reasonable attorney's fee for the benefit of the other party."

the child to a pediatrician because of behavioral and learning problems. The mother concedes that she has difficulty in controlling the son because of his hyperactivity and indicated desire to live with his father. She suggests that the son's problems will be settled "when he knows once and for all where he is going to live."

The "great weight of the evidence" relied on by the majority is the testimony of the pediatrician to whom the husband took the child during visitation and called as a witness. With the exception of testimony of the husband, there is no supporting evidence for making a change of custody.[1] The pediatrician visited twice with the two children for about 40-50 minutes per visit in August 1975 and June 1976. He offered no medical opinion concerning either child's condition. Rather his testimony consists of recitals of the children's complaints to him about "fighting" and "bickering" in the mother's household and the son's allegations that he was treated unfairly. From this he concluded:

"A. I feel that from the situation as these children described it to me, it was impossible for me to see how the children remaining in their mother's and stepfather's home, how the situation could be worked out so that Ken would adjust to that home. * * *"

The pediatrician has never examined the mother and has no knowledge of the mother-son relationship other than that relayed to him by the children. He conceded that there is a likelihood that the son in his interview might have painted an unfavorable picture of the mother in order to please the father.

The husband also had the children evaluated by a psychiatrist and called the psychiatrist as a witness. The psychiatrist made a clinical examination of both children and opined that the son is typical of youngsters

---

[1] As the moving party, the objectivity of the husband's testimony necessarily is suspect. The father admits that he has no communications with the mother, has never been in the mother's home and has no firsthand knowledge of the mother's home environment.

"* * * in * * * the hyperkinetic range and who do suffer a degree of impulsivity and learning disability to some degree.

"Whether or not they're having difficulties in the domestic situation, it would appear to me that in a clinical sense that getting this matter settled one way or another would be of benefit to Kenneth particularly.

"* * * * *

"I was able to come to the — to this opinion; that is, that I did not see any really serious neurotic disorder or any evidence of severe mental illness in either of the children."

The psychiatrist also examined the father and concluded that although he is a "suppressor" of his emotions, "there were no evidences that I could see in any contacts with him that would suggest that he could not do an adequate and meaningful parenting job." The psychiatrist declined to make any recommendation concerning custody because he had not examined the mother and had no knowledge of the home situation or her fitness as a mother other than what was related to him by the children. As to the credibility of the son's hearsay complaints about the living conditions in his mother's home, the psychiatrist testified:

"Q. Dr. Dixon, do you think that Kenny Moffett [the son] is smart enough or intelligent enough to be able to utilize the strain situation between his parents in terms of getting his own way from time to time?

"A. Yes, surely.

"Q. Did you get the feeling that he did that?

"A. I didn't get the feeling that he necessarily did it any more than any child. But every child that I've ever seen, unless they were retarded, senses that situation and uses it."

The rule of law is that a motion for modification will not be entertained unless there is a showing of substantial change of circumstances. This is not merely a rule of judicial convenience, but is designed to stabilize family relationships. In *Niedert and Niedert,*

28 Or App 309, 313, 559 P2d 515, Sup Ct *review denied* (1977), we said:

"The change-of-circumstance rule is designed to serve two functions: to discourage repeated litigation of the same issues and, more important, to provide young children with a stable environment. *Crane v. Crane,* 17 Or App 637, 523 P2d 596 (1974). We have long recognized the importance of a stable and secure home life and have consequently placed a high value on the stability of parental relationships. Therefore the rule requires a showing of some change in circumstances which makes either the benefits to be gained from a change of custody or the detriment caused by not making the change outweigh the damage done to a child who is exposed to shifting parental figures. [citing case]"

Another consideration that deserves some attention in a change of custody proceeding is the effect on the parents. In an initial custody proceeding a trial court's award of custody is usually a hard choice between two viable alternatives and the parents usually understand a court's decision as such. In contrast a change of custody such as we have here, regardless of the reasons advanced by the court, inevitably will be interpreted to mean that the mother is unfit to raise these young children. While the court's primary concern must be the best interests of the children, we cannot totally ignore the devastating emotional impact on the mother.

The inherent fallacy of relying solely on the testimony of the pediatrician who has no firsthand knowledge of the mother's home environment as a basis for change of custody is pointed out in the cross-examination of the psychiatrist called by the father.

"Q.   Dr. Dixon, in fairness then on the other side of the coin, would your opinion also be that you see no objection to them remaining with their mother?

"A.   Well, it would be my — the objection would be that in the first place I think that insofar as Kenneth is concerned, I think that there's more than just the

custody. I have no proof of it other than the fact that, you know —

"Q. So you really can't give us an opinion.

"A. I can't give you a good opinion. I can only answer in the sense that I don't have enough information about the mother's family to give the same opinion.

"Q. Dr. Dixon, in your discussions with Mr. Moffett, did he indicate how his lines of communication were with his ex-wife?

"A. Yes, he discussed the fact that they were pretty poor.

"Q. If the lines of communication between the two natural parents were opened up in the sense that they could sit down at a table side by each with you, not the children now, do you think you could help them resolve the childrens' problem without any talking about custody, just give them both insights that they might use to give the children the security that they need?

"A. That would be preferable than going through all this kind of thing, which I'm sure is terribly traumatic to the children and the parents too. I don't know because I haven't sat —

"Q. In your handling this matter, was that ever requested by Mr. Moffett, that you sit down with him and his wife—his ex-wife, and the children and discuss their home family situation? Was that ever done?

"A. I don't believe it really was. I indicated to him the limitations of my seeing just one side of the issue, and I've tried to be direct about what that does to limit any study.

"Q. In terms of your opinions here today, if that had happened, would you feel that any opinion you gave would be substantially more valid than what you're talking about today?

"A. I think it might be more inclusive and I might be able to answer your question better about is the mother's home as good as the father's home.

"Q. In indicating you did not see any abnormality, would you say they're relatively normal children?

"A. I would say that Cassandra appears to me to be quite a flexible, normal child. I think Kenneth is normal in the sense that he doesn't have a psychiatric disorder like a psychosis or bad neurosis that I can see. I do think that Kenneth has a problem that's reflecting itself in

school, is being largely attributed to the custody problems, but I think it's probably more far reaching that [sic] that.

"Q. Could it also be attributed to the fact that he's an adopted child originally?

"A. My findings wouldn't suggest that that is the primary problem. The primary problem is that he's a hyperkinetic child.

"Q. Needs more direct attention by his parents.

"A. These children do respond by and large to — I mean, their better adjustment is encouraged by one-to-one relationships frequently.

"Q. Are they of an age that the legal custody issue should be discussed with them, do you think? [Reference to the fact that the father advised the son that he intended to bring custody proceedings.]

"A. Well, I don't — you mean that the parent should be talking about that decision?

"Q. Yes.

"A. I surely don't think so."

On redirect examination the psychiatrist testified:

"Q. Do you feel that these expressions are their desires, that it's important to give weight to those expressions or desires?

"A. I think that it is essential to the well being of these children that this issue be settled, that they not be in this kind of constant dilemma about custody. I don't know whether I answered the question.

"Q. You answered the question, but do you feel that a child's desire at the age of these children should in and of itself be given weight and consideration considering their future well being?

"A. I think it should be given weight perhaps, but it should be just one of the issues that go to deciding such a matter."

The husband has failed to show any material change of circumstances. The son's hyperkinetic condition is not a change of circumstances but was a pre-existing condition. The uncontradicted evidence is that the mother and stepfather are loving dutiful parents confronted with the problem of raising a difficult child, a problem that has been compounded by

the custody dispute. The only change of circumstances was the mother's remarriage and unquestionably the difficulty that any child would have of adjusting to a new family situation. However, this alone is not a sufficient change of circumstances, particularly in view of the fact that the husband testified that he expects to remarry in the immediate future to a woman who also has two small children.

This case presents the same dilemma that we faced in *Niedert and Niedert, supra.* As a result of the lower court's order, the children have been living with the father for the past ten months and thus reversal results in further disruption of family relationships. In *Niedert* we suggested a procedure for the application and granting of stays in this type of child custody proceeding, but unfortunately that case was decided after the order in this case. In *Niedert* we concluded that to not reverse would deprive the mother of her right of appeal. For the same reason I believe we should reverse here.