Argued and submitted November 18, 1981, affirmed May 12,
reconsideration denied July 1,
petition for review denied July 27, 1982 (293 Or 394)

In the Matter of the Marriage of

GODDARD,
*Respondent,*
*and*
GODDARD, nka Peterson,
*Appellant.*

(No. 25444, CA A21348)

644 P2d 651

R. Craig McMillin, Salem, argued the cause for appellant. With him on the brief was Mills & McMillin, Salem.

J. Michael Alexander, Salem, argued the cause for respondent. With him on the brief was Brown, Burt, Swanson, Lathen & Alexander, Salem.

VAN HOOMISSEN, J.

Affirmed. Costs to respondent.

## VAN HOOMISSEN, J.

Mother appeals a trial court order modifying a dissolution decree by changing custody of three of the parties' children from mother to father. We review *de novo.*

No constructive purpose would be served by publishing a detailed opinion in this case. *See Sarty v. Forney,* 12 Or App 251, 253, 506 P2d 535 (1973). After reviewing the record, and having considered the issues raised in the light of relevant statutory and case law, we affirm the decision of the trial court. *McFadden v. McFadden,* 206 Or 253, 257, 292 P2d 795 (1956); *Rea v. Rea,* 195 Or 252, 261, 245 P2d 884 (1952); *Jewell and Jewell,* 51 Or App 129, 624 P2d 1092, *rev den* 290 Or 853 (1981); *Van Dyke and Van Dyke,* 48 Or App 965, 968, 618 P2d 465 (1980); *Green and Green,* 48 Or App 725, 728, 617 P2d 925 (1980); *see also Maddox and Maddox,* 56 Or App 345, 641 P2d 665 (1982).

Affirmed. Costs to respondent.

### JOSEPH, C. J. dissenting

This case was originally heard in a three-judge department of this court, like every case we hear. A majority opinion was approved by the department, one judge dissenting and one judge concurring but expressing a particular reservation. In accordance with the internal operating practices of this court, the case was referred to a full conference of the court and then was taken in banc for review. The majority now affirms the trial court. Believing that there underlies that result a substantial change in the law relating to custody of children, I dissent so that the change may be disclosed fully for the benefit of practitioners.

Since 1977, the leading case in this court about the change of circumstances standard for changing custody of children has been *Niedert and Niedert,* 28 Or App 309, 559 P2d 515, *rev den* (1977). In that case we said that "the rule requires a showing of some change in circumstances which makes either the benefits to be gained from a change of custody or the detriment caused by not making the change outweigh the damage done to a child who is exposed to shifting parental figures." 28 Or App at 313. We refused to

hold "that discreet sexual intimacy between single adults is a moral trangression justifying a change of custody." 28 Or App 314. Also:

"* * * A change of circumstances is not established by showing that the custodial parent has made occasional mistakes since the entry of the decree, for every parent does, and a working parent in particular may have special problems with child care. Where the proof of change of circumstances is based upon specific instances of purported parental misfeasance — and often that is the only knowledge available to a concerned non-custodial parent — these events must be of a nature or number that reflect a course of conduct or pattern of inadequate care which has had or threatens to have *a discernible adverse effect upon the child.* * * *" 28 Or App at 314. (Emphasis supplied.)

The sense of the rule in *Niedert and Niedert, supra* is contained in ORS 107.137(4):

"In determining custody of a minor child pursuant to ORS 107.105 or 107.135, the court shall consider the conduct, marital status, income, social environment or life-style of either party *only if it shows that any of these factors are causing or may cause emotional or physical damage to the child.*" (Emphasis supplied.)

With that background, and passing the suggestion in the majority that on *de novo* review we give controlling deference to the experience of the trial judge whose decree or modification we are reviewing, I turn to the substance of the case at hand.

The parties were divorced in January, 1979, and mother was awarded custody of their five children — Robin, Lori, Debbie, Brandy and Shannon, who were respectively 17, 16, 15, 10 and 8 years old at the time of the modification hearing. In August, 1979, Lori and Debbie moved in with father, and the decree was modified by a stipulated order to reflect that change of custody.

Although the present controversy originally involved the custody of the three other children, our concern now is with Brandy and Shannon, the two youngest children. Robin is now over 18 years old. In April, 1981, several months after father filed his motion for change of custody in the present case, she ran way from her mother's home to live with her boyfriend at his parents' house and

has been living there since. Mother is not happy with this arrangement, but she said that if Robin wanted to live with her father, she would not object.

In awarding custody of Robin, Brandy and Shannon to father, the trial court found that there had been a substantial change of circumstances and that the modification was in the best interests of the children. Although, on my review of the record I might agree that father may be the more suitable custodial parent, I am not persuaded that mother is unsuitable. More importantly, however, there is nothing in the record to support the trial court's finding of a change of circumstances since the original decree to justify a change of custody.[1]

The hearing was held on May 26, 1981. Robin, Lori and Debbie, the oldest children, testified. They said that they had been upset by mother's relationships with men in the six months following the divorce. During that time, three different men stayed overnight with mother in her bedroom. In addition, mother spent four days in Hawaii with a man, leaving the girls with a babysitter. They testified that they did not like the man with whom mother set up housekeeping and eventually married (and also eventually divorced). They said that they had been embarrassed by his demonstrations of "affection" toward mother. There were occasions when he fondled her breasts in their presence, and they were disturbed that they could hear the sounds of lovemaking coming from mother's bedroom at

---

[1] In *Jewell and Jewell,* 51 Or App 129, 624 P2d 1092 (1981), we reiterated the Supreme Court's view in *Rea v. Rea,* 195 Or 252, 245 P2d 884 (1952), that:

" '* * * [W]e have grave doubts as to whether any appellate court, acting on a cold record, is as likely to arrive at a wise decision concerning child custody, as is the trial judge who sees the parents, hears the testimony, and observes the child. It is for this reason that we have repeatedly held that the decision of the trial court is entitled to great weight in such cases. This court is ill-equipped to exercise a wise and humane discretion on a record which, of necessity, fails to disclose the subtle, but highly persuasive, evidences which are manifest to the trial judge. A wise appraisal of the character, fitness, emotional stability, affection, hostility, or motive, of the parties to a contested divorce case, who are competing for the custody of a child * * * requires more than can generally be made to appear on the printed page.' 195 Or at 261." 51 Or App at 131-32.

However, deference to the trial court's findings is more appropriate when the question is which parent can best provide for the welfare of the child than when it is whether circumstances have changed since the decree.

night and in the early morning. There was no evidence, however, that mother was aware of her daughters' reactions or that she insensitively or intentionally disregarded their feelings. Furthermore, there was no evidence that Brandy or Shannon, the only children involved here, were even aware of, let alone adversely affected by, mother's sexual activities.

Robin said she ran away from home because

"* * * I was getting tired, and it was getting harder for me to get things done and to grow up my own life. And [mother] was always complaining that she had been refused her childhood because she had got pregnant so young, and I didn't feel like regretting growing up, and so I decided it was about time she was a mommy for awhile."

She testified that mother gave her $20 a week to "raise the kids, clean the house and to cook the meals." She had to babysit Brandy and Shannon from the time they came home from school until mother came home from work and on those evenings when mother went out. She felt burdened by the household responsibilities required of her.

Neither Brandy nor Shannon testified at the hearing. The only testimony about their reactions to the events since the divorce was given by expert witnesses. A clinical psychologist testified for mother and said that Brandy and Shannon are doing well in the present custodial situation and that there would be no benefits from a change in custody. He found that they are well adjusted and have good feelings about both parents. A social worker testified for father that the children viewed him as the "psychological parent" and that they perceived no guidelines from mother. She said that all of the children preferred to live with father and that he exhibited exceptional parenting skills.

At the time of the hearing, mother, 34, had recently left her full-time job as a secretary-receptionist and her part-time job as a waitress in anticipation of her marriage to the man with whom she was then living. They planned to move to Vancouver, Washington, where her husband would be a partner in a business which would produce an income, they both said, which would allow her to stay home with the children. Father, 37 at the time of

the hearing, had remarried. His present wife, 21 years old, has a four-year old daughter from a previous marriage who lives with them.

The burden was on father to show that there had been a substantial change of circumstances not contemplated at the time of the original decree "relevant to the capacity of the plaintiff or custodial parent to properly take care of the child," *Greisamer and Greisamer,* 276 Or 397, 400, 555 P2d 28 (1976), and which would enhance or have an adverse impact on the welfare of the children. *Padbury and Padbury,* 46 Or App 533, 536, 612 P2d 321 (1980). We cannot realistically say that mother's sexual relationships since the divorce are wholly unanticipated events or interfere with her capacity to care for her children. It is not an implied condition of custody that the custodial parent be sexually inactive; the trial court should not penalize a parent for indiscretions when there is no evidence of adverse effects on the children in question. *See* ORS 107.137(4), *supra* n 4; *Niedert and Niedert, supra; Jewell and Jewell,* 49 Or App 903, 620 P2d 967 (1980), 51 Or App 129, 624 P2d 1092, *rev den* 290 Or 853 (1981). Although there is some evidence that mother's second husband was overly demonstrative sexually; the record does not support the conclusion that mother was intentionally indiscreet, that she is currently indiscreet or that the two youngest children have suffered as a result of her post-divorce relationships.

Mother's placing much of the responsibility of "raising a family" on the oldest daughter at home does not sustain a finding of a lack of concern for the welfare of the children sufficient to justify a change of custody. As a single parent, mother felt required to work two jobs. Although it may be unfortunate or even unfair that that daughter had to share the household responsibilities with mother, we should not say that such shared responsibilities were unanticipated at the time of the original decree or are circumstances justifying moving the children from their present situation.

What is presented to us is a situation in which the three older teenage children succeeded in playing the opportunity to run to the other parent (or, with respect to one of

them, to move in with someone else). The *only* evidence father was able to produce, other than the complaints of the children whose custody is *not* in issue here, was the testimony of a witness who can fairly be described as a "nosy neighbor," whose obvious dislike for mother so colored her testimony as to make it worthless. The trial judge's decision to change custody was based on that evidence. For this court to uphold that result is totally without any foundation in the law. It may or may not be "good" morality, but it is very bad law. It is also new law.

Judges Richardson and Gillette join in this dissent.